# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**EXPERT WITNESS REBUTTAL REPORT OF TY R. SAGALOW**

**Scottsdale Insurance Company**

**v.**

**CSC Agility Platform, Inc. et al.**

**December 9, 2018**

1.  I have been asked by counsel for Defendant and Counterclaimant CSC Agility Platform,
Inc. f/k/a ServiceMesh, Inc. and Defendant Computer Sciences Corporation (collectively
"CSC") to provide an rebuttal expert opinion to Plaintiff and Counter-Defendant
Scottsdale Insurance Company's expert, Mr. Larry Goanos. As I attended Mr. Goanos's
deposition held on January 7, 2013, this rebuttal report will include both Mr. Goanos's
original expert report, dated December 31, 2018, as well as his deposition testimony.

## STATEMENT OF FACTS

2.  After an introduction and other preliminary matters, Mr. Goanos begins his report with a
"statement of facts". While Mr. Goanos presents his "statement of facts" (paragraphs 19-
34) as "facts", some of his statements are clearly in dispute by the parties and contrary to
the weight of evidence I have seen.

3.  In paragraph 27, Mr. Goanos writes:

> In or around January 2013, ServiceMesh asked its then-Chief Technology Officer,
> Shawn Douglas, to approach potential acquirers and initiate investment/acquisition
> discussions. He contacted Dell Ventures, EMC, VMware, Microsoft and Computer
> Sciences Corporation.

4.  In fact, there is no evidence of this from the materials I have reviewed other than a self-
serving statement by Mr. Douglas himself in connection with a lawsuit he brought
alleging that ServiceMesh failed to properly compensate him for all the "work" he did in
connection with the CSC acquisition. In such a claim, Mr. Douglas would be highly
motivated to present himself in a false light as a leader in the acquisition strategy.

5.  The only persons allegedly in the room when Mr. Douglas allegedly received these
instructions were ServiceMesh's Chief Executive Officer ("CEO"), Eric Pulier, and
Jeffrey Drake, Executive Vice President of Corporate Development,. Mr. Pulier has
provided no testimony or affidavit supporting that this conversation every took place,
and Mr. Drake's has testified that it never did and that Mr. Douglas was never asked to
approach companies for the purpose of initiating an acquisition discussion.

-2-

6.  This factual error of Mr. Goanos has some impact on the insurance coverage issue in
    dispute in so far as the application questions regarding mergers and acquisitions
    ("M&A") ask whether *ServiceMesh* conducted certain activities (e.g. "negotiated" a
    M&A transaction) or had a certain state of mind (e.g. "contemplated" a M&A
    transaction).  Mr. Pulier was the chairman of the board of directors of ServiceMesh (the
    "Board") and could, in theory, represent the company's state of mind in some
    circumstances or cause the company to enter into M&A negotiations but, in contrast,
    neither Mr. Douglas nor Mr. Drake was on the Board.  In other words, from an insurance
    perspective it certainly doesn't matter what Mr. Douglas did or did not do, or
    "contemplated" or did not "contemplate" *unless* his actions were ordered by the Board,
    or perhaps its chairman (if the chairman believed the Board would be supportive) in
    which case his state of mind and actions might represent that of the Board and, by
    extension, ServiceMesh.

7.  Similarly, Mr. Goanos states in paragraphs 28 and 29, without evidence, that on
    "February 24, 2013, ServiceMesh began discussing a potential acquisition of Computer
    Sciences Corporation" and that on or about "March 5, 2013, ServiceMesh commenced
    due diligence activities with Computer Sciences Corporation in connection with
    Computer Sciences Corporation's contemplated acquisition of ServiceMesh."  These
    statements are, at best, misleading as the "due diligence" done by CSC encompassed,
    according to the documents I have read, both a business partnership with ServiceMesh
    (i.e. a *customer* relationship, perhaps with some joint marketing and/or reselling) as well
    as an acquisition.  Indeed, according to the testimony of Jeffrey Drake, these two-track
    conversations were commonplace during the five years of ServiceMesh's existence and
    always resulted in a customer relationship (or no relationship) prior to the acquisition by
    CSC.

8.  The reality is that Mr. Goanos seems to have just cut and pasted these "facts" from the
    Scottsdale's pleadings without refence to any source document he read to support them
    since, in fact, there are really none.

9.  To be fair to Mr. Goanos, when asked about the "source" of these paragraphs of "facts",
    in his deposition Mr. Goanos readily admitted that he has no reason to know whether any

1  of these paragraphs are true and that he did in fact just copy them from Scottsdale's First

2  Amended Complaint[1].

3  ISSUE AND OPINION

4
5  10.   Mr. Goanos begins this section with a summary of his overall opinion:

6  Yes, consistent with insurance industry custom and practice – as well as the logical

7  reading of the plain English language used – ServiceMesh *undoubtedly*

8  contemplated a merger or acquisition prior to its submission of the Scottsdale

   Application which indicated otherwise, and ServiceMesh was involved in the
9
   negotiation of an acquisition in the eighteen months prior to the execution of the
10  application. (Emphasis added).

11
12  11.   Here Mr. Goanos indicates his bottom line opinion that the insurance applicant made a

   misrepresentation (later he argues that the misrepresentation was material to the
13  underwriting risk[2]) when it answered "no" to question 7 of the Scottsdale renewal

14  application ("Has the Company in the past 18 months … *negotiated* … merger,

15  acquisition or divestment" (emphasis added)) as well as when it answered "no" to

16  question 8 of the Scottsdale renewal application ("Does the Company *contemplate*

17  transacting any merger or acquisition in the next 12 months…[3]" (emphasis added)).

18  12.   For the reasons set forth in this rebuttal report, I disagree with Mr. Goanos.

19

20  ---

[1] Depo. of L. Goanos (Rough) at page 34, line 2 to page 35, line 14.
21  [2] Mr. Goanos admits in his deposition that he has no opinion on the other trigger for claim denial,
   that the insured had the "intent to deceive" when it completed the renewal application. (*See* Depo.
22  of L. Goanos (Rough), page 79, line 20 to page 80, line 7).  Indeed, from my review of the file,
   there is no evidence to believe that the insured (ServiceMesh) had an "intent to deceive" and thus,
23  I believe, Scottsdale (and certainly Mr. Goanos) is asserting the other part of the warranty
24  provision, "material misrepresentation" as a justification for its claim denial.
   [3] Mr. Goanos also refers to a similar question in the Beazley E&O application (paragraph 24) but
25  gives no support as to why an application for an unrelated insurance carrier for another line of
   business falls within the term "Application" in the Scottsdale Policy.  He fails to do this because
26  there is no support. The Beazley application is simply irrelevant to the issues at hand. (As I
   mentioned in the original report, if it was relevant, it would actually be counter-productive to
27  Scottsdale position in this case.)
28

-4-

13.   Before discussing the specifics of my disagreement, I note that Mr. Goanos correctly
uses the word "undoubtedly" in his above summary opinion[4]. That is to say he opines
that ServiceMesh "undoubtedly" *contemplated* a merger or acquisition and was involved
in the *negotiation* of such an acquisition. Mr. Goanos uses the word "undoubtedly"
purposely since Mr. Goanos is aware, as I am, that if there is *reasonable doubt*
surrounding whether ServiceMesh "contemplate[d]" M&A as of June 26, 2013 or, in the
preceding 18 months, negotiated an acquisition, Scottsdale cannot exclude the underlying
claim. Put another way, as long as ServiceMesh's interpretations of the words
"contemplate" and "negotiated" are reasonable, the fact that Scottsdale may have
(subjectively or otherwise) another interpretation (even a reasonable one) is irrelevant. If
the insured's interpretation is a reasonable one, as I believe it is (for the reasons
discussed in this report), Scottsdale simply cannot exclude the underlying claim.

14.   Mr. Goanos admits this to be in the case in his deposition:

Q-   When you say "undoubtedly" if there was any doubt, if there was doubt about
whether or not ServiceMesh did in fact contemplate a merger or acquisition, would
Scottsdale be able to rely on the exclusion they cited in this case to deny coverage
and try to recoup those amounts[5]?

A-   … I think it would be bad faith on the carrier's part to assert an exclusion denying
coverage for a claim without being sure that valid – that the ground is valid. So if
they had any doubt, I don't think they would be able to assert the claim definitely,
assert the exclusion definitely[6].

…

Q-   You say undoubtedly here but if there was any doubt about whether or not
ServiceMesh Incorporated contemplated a merger or acquisition, in that situation,

---

[4] Mr. Goanos reaffirms the use of this word (undoubtedly) in his deposition, also using the words
"overwhelmingly obvious". (Depo. of L. Goanos (Rough) at page 37, line 8-9).
[5] Depo. of L. Goanos (Rough) at page 38, lines 7-13.
[6] *Ibid*. at lines 17-25.

-5

1    that hypothetical situation, Scottsdale wouldn't be able to deny coverage that they
2    asserted here[7]?

3    A-  ...But yes, I would say if there were a doubt, you wouldn't be able to rely on that
4    conclusion definitely to justify denial of coverage[8].

5    And in a similar vein, Mr. Goanos remarked:

6

7    A-  Yeah, well, and I will reiterate I am not here to offer legal opinions.  As far as custom
8    and practice in the insurance industry, where there is a true ambiguity and not a
9    manufactured one, then yes, it can be construed against the carrier generally as a
     drafter of the policy[9].

10

11   SHOULD "CONTEMPLATE" (AND PRESUMABLY "NEGOTIATED") BE INTERPRETED
     IN THEIR "PLAIN-ENGLISH" MEANING, AND IF SO, TO WHAT EFFECT?

12

13   15.   In paragraphs 35-42 of his report, Mr. Goanos argues that the terms at issue in the
14         Scottsdale renewal application should be ascribed their "plain-English" meaning. He
15         then proceeds to argue that the plain-English meanings of these words favor Scottsdale.
           He is incorrect on both points.

16

17   16.   Mr. Goanos essentially argues that since the word "contemplate" is not defined in the
18         application or policy, it must carry a "plain-English" meaning[10].  I have drafted hundreds
19         of insurance policies and endorsements for multiple insurance carriers over the past 35
           years and the position that any undefined word in an insurance policy automatically
20         carries a "plain-English" meaning is simply incorrect.

21

22   17.   Insurance policies contain both defined and undefined words.  In some instances, a
23         defined word can be defined consistent with its ordinary or common sense meaning.
           Indeed, most defined words are so defined.  Of course, in other cases a defined word can
24         have a "special meaning" or a meaning which is other than its "plain-English" or

25

26   [7] *Ibid*. at page 40, lines 3-8.
     [8] *Ibid*. at lines 14-17.
27   [9] *Ibid*. at page 39, lines 20-25.
     [10] *See* L. Goanos Report, paragraph 39.
28

ordinary meaning. The same theory equally applies to undefined words. Most undefined words carry their ordinary or plain-English meaning. However, many carry a "special meaning", one that can only be known by reference to a specific industry or body of information.

18. The Scottsdale policy in question contains many examples of this.

19. The first examples of undefined words that have a special meaning can be found in the General Terms & Conditions of the Scottsdale policy.

    a. References to "mailing" in the Section E. Cancellation have, pursuant to industry custom and practice, been expanded to include emailing. When these policies were first written the phrase "mailing" meant only United States ("U.S.") mail from the United States post office but due to insureds having over the years a reasonable expectation that the phrase should also include emailing of claims or notices of cancellation, the insurance industry eventually expanded the "plain-English" meaning of the word to include its more modern variation[11].

    b. Also in the Cancellation provision (as well as the Takeover provision in operation here) is the undefined term "unearned premium". This references a particular type of accounting, one only used in the insurance industry. To understand what this term means, one has to consult an insurance accountant.

    c. Furthermore, Section F. Estates, Legal Representatives, and Spouses, which deals with additional insureds, includes several undefined terms, like "spouses". The word "spouse" in the Scottsdale policy is restricted, pursuant to industry custom and practice, to a spouse recognized by the state. So, for example, "common law" spouses are not spouses for the purposes of the Scottsdale policy except in those few states that expressly recognize such unions. A fact that is disappointing (or not) to a number of couples I know.

---

[11] Some policies expressly state that the emailing of notices is acceptable but where this is not stated explicitly, it is commonly understood and often done.

d.  Other examples include references to the word "agent" (which carries the special meaning to that term provided by agency law) and "indemnified" (which carries the special meaning to that term provided by corporate indemnification law).

20. Sometimes an entire *sentence* can have a special meaning. For example, paragraph b of the definition of Claim in the D&O section of the Scottsdale policy reads:

> b.  a written demand by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company** to bring a civil proceedings against of the **Directors and Officers** on behalf of the **Company.**

The meaning of this sentence for the purposes of the insurance contract cannot at all be gleaned from the words used, all of which have common sense meanings. This sentence refers solely and exclusively to shareholder derivative demands made pursuant to the applicable corporate law. (For example, for Delaware Corporations, Del. R. Civ. P. 23.1(a)). Any interpretation of this sentence solely pursuant to the "common understanding" of the words used would led the reader very much astray.

21. Perhaps one of the most litigated undefined phrases in a D&O policy is the undefined phrase "first made" which requires that for a Claim (a defined word) to be covered it must be "first made" during the policy's policy period. For example, insurers contend, (sometimes much to the confusion of the insured) that the phrase "first made" does not simply require that the actual Claim for which coverage is being requested must be first made during the policy period but rather that additionally ALL claims which are "related" to the claim for which coverage is being requested must *also* be made during the policy period. For a "claims made" insurance professional skilled in the art, this makes some sense (at least in some circumstances) but for an lay person looking simply at the words "first made" from a point of view of their plain-English and ordinary meaning, this widespread industry "special meaning" would be far from obvious.

22. In a similar vein, the phrase "duty to defend" can only be understood by reference to a large body of case law, well beyond the simplicity of those three small undefined words.

23.  As mentioned above, there are even special meanings for undefined terms in the
Definition section of the Scottsdale policy where, to understand the meaning of the word,
the reader must consult a specialized area of law or body of knowledge. For example,
the definition of **Company** includes references to the "debtor-in-possession" or the
"bankruptcy estate". These phrases have the special meanings assigned to them by
bankruptcy law and do not mean, for example, any person or entity who "has debt" but is
still "in possession" of his or its assets as the words themselves seem to imply. Another
good example is the word "non-profit" in the policy's definition of **Outside Entity.** This
word in meant pursuant to industry custom and practice to be restricted to not for profit
organizations recognized as such by the U.S. Internal Revenue Service (the "IRS"). So,
even if the owners of a particular company do not have in the mind a goal to make a
profit, the company is not considered a "non-profit company" for the purposes of the
Scottsdale policy unless and until it is so recognized by the IRS.

24.  Finally, much to the discomfort of insureds, undefined terms in exclusions are frequently
assigned a special meaning that can only be known by consultation with an outside body
of law or knowledge. Exclusion 1.a. of the D&O section of the Scottsdale policy
excludes "assault, battery, invasion of privacy". These terms are meant to have their
legal civil tort meanings not their common sense meaning. Similarly, the pollution
exclusion refers to "discharge, dispersal, release, escape, seepage, mitigation or
disposal". These words are meant to be defined by reference to their meaning in
environmental law and litigation, not their common sense meaning. The term
"deliberately fraudulent" in the policy's fraud exclusion does not apply to violations of
10(b)(5) of the Securities Exchange Act of 1934 even if actions complained of in the
minds of a non-professional seem to be "deliberately fraudulent" (and even if a causal
reading of that provision would seemingly support such a common sense reading). The
phrase "initial public offering" in the policy's SEC exclusion means an IPO as defined
by the securities laws and not, for example, an offering of securities to the public for the
first time in a crowdfunding offering or an SEC exempted private sale. Finally, the
exclusion for the "infringement, misappropriation or violation of copyright, patent,
service marks, trademarks, trade secrets, title or other propriety or licensing rights" has

the meanings assigned to those words by Intellectual Property law regardless of their common sense meaning.

25.  In his deposition, Mr. Goanos double downs on his theory that undefined words always carry their plain-English meaning and refers the undefined word "director" as an example of an undefined word which carries an ordinary meaning and not a special meaning[12]. In fact, that is a good example of the opposite. As Mr. Goanos states in the context of a D&O insurance policy the term "director" means a member of the corporation's board of directors. However, in common day business parlance, the term "director" is widely used for a host of positions in an organization. A person can be the "Director of Sales" or "HR Director". These positions are not considered a "director" as that word is used in the insurance policy. Thus, contrary to Mr. Goanos's testimony, the term "director" is, in fact, an excellent example of a undefined word in the policy with a special meaning inconsistent with the word's a plain-English" or common meaning.

26.  The point of the above is to show that over and over again a D&O policy has undefined words whose meaning is derived *not* from the "plain-English" meaning. Instead, these undefined terms have the meaning assigned to them by a specific industry or specific body of law. In many cases, a clue as to their special meaning can be seen by looking at the words that surround the terms, or the industry context of the paragraph (bankruptcy, civil tort, tax, corporate law, M&A, etc.) in which the words appear.

27.  It is also worth noting that there are words and concepts in the insurance policy which do not appear in the policy itself but insureds are expected (at least from the point of view of the insurer) to know them. For example, the Scottsdale policy contains in Section F. of the Directors and Officers and Company Coverage Section, SETTLEMENT AND DEFENSE. Nowhere in that section is it explicitly stated that the insured must forward to the insurer any settlement offers it receives so that the insurer can evaluate whether to settle. Yet, few insurers would argue that this is not one of the insured's obligations under the policy. In addition, although the Scottsdale Policy does not contain a

---

[12] Depo. of L. Goanos (Rough) at page 42, lines 14-19 ("Maybe a word such as I don't know, director, you know who a director is because they are officially designated or just common everyday words, and, but, the, we don't need define, they are understood").

contractual duty to settle a claim against an insured, it is generally understood that the insurer indeed has a duty to settle such a claim where liability and damages are reasonably clear, and may not simply wait until a judgment is entered against the insured before covering the claim. No reasonable insurer would ever argue that under this kind of policy, the carrier has a duty to settle even though the policy contains no such duty.

28. With the above rules in mind, it is clear that the words "contemplate" or "negotiated" in the M&A questions of the Scottsdale renewal application have a special meaning with reference to a M&A environment.

29. Mr. Goanos reference to the MacMillan Dictionary for the proposition that the term "contemplate" means "to consider the possibility of something happening" is inconsistent with industry custom and practice. To understand the meanings of these words, one must look at the M&A industry. What does "contemplate" mean in an M&A environment? Even more particularly, what does it mean to a small hi-tech, VC backed, company.

30. The same question should be asked regarding the word "negotiated". Does the common sense definition of "negotiated" correctly describe the proper meaning of the word in a M&A environment?

31. For D&O underwriters, the key question is what *actions* need to take place in a M&A environment before a hi-tech, VC backed, company can be reasonably said to be "contemplating" a merger or acquisition deal. This is the proper method under industry custom and practice to understand the meanings of these words, not the method proposed by Mr. Goanos and the plaintiff which would define "contemplate" as "to consider doing something in the future.[13]" Indeed, if this was the proper definition then every technology company I have ever seen would have to answer the M&A question "yes", thus resulting in a meaningless application question.

32. From an underwriting point of view, it is critical not just to understand what the underwriter wants to know but also what it *doesn't want to know*. The D&O underwriter

---

[13] *Ibid.*

-11

does not want to know that a small hi-tech, VC backed, company wishes one day to be acquired by a larger technology company. The underwriter already knows that. The D&O underwriter does not want to know that a small hi-tech, VC backed, company is open to discussions about being acquired. The underwriter already knows that. A good D&O underwriter also knows that small technology companies often mix conversations with their customers, talking about "business partnerships", "investments" and acquisitions all at the same time. A good D&O underwriter knows that the vast majority of these conversations go nowhere and knowing about them would only be irrelevant "noise" to the underwriting process.

33. It is also worth noting that Mr. Goanos by his own admission is not an expert in private equity or financing as he readily admits in his deposition[14]. Accordingly, Mr. Goanos is not the expert as to how technology companies discuss partnerships. While my background includes being a founding member of a successful technology company (Lemonade) with VC (Sequoia Capital, Google and many others) backing, even I would have to defer to someone like Jeffrey Drake as the real expert on when technology companies are contemplating a merger or acquisitions or whether they could even enter into negotiations relating thereto without Board approval.

34. What does a good D&O underwriter want to know about a M&A deal with their hi-tech insured? It is when one (or more likely a series) of significant events take place. Examples of such significant events would be minutes of a (or more likely more than one) board meeting discussing a potential acquirer who has already taken substantial steps in wanting to acquire the company. Another example is the hiring of an investment advisor to value the company and perhaps create a press release indicating the company is up for sale. The CEO/Chairman receiving and signing a proposed term sheet (even before any formal board meeting took place) could be considered by some underwriters to be a significant M&A event trigging a corporate state of mind of "contemplation" (and perhaps negotiation[15]).

---

[14] *See* Depo. of L. Goanos at page 94, lines 6-9.
[15] As Mr. Goanos stated in his deposition, there could conceivably be M&A deals done without a "negotiation" if, as he said in his example, an acquirer sends a terms sheet without any prior

35. However, my reading of the materials listed in Appendix A of my report does not indicate that *any* of these things happened. Most significantly to me is the fact that the NDA (non-disclosure agreement) was not signed by ServiceMesh until *after* the new policy period began, a term sheet was not sent to them until *after* the new policy period began and there was not a single board of directors (or even informal board meeting from what I read) discussing the acquisition until *after* the new policy period began[16].

36. While Scottsdale, in its most recent motion for summary judgement, focused exclusively on question 7 and the trigger of prior "negotiation", their own expert, Mr. Goanos, in his expert report did the opposite and tended to focus on question 8. Indeed, in his deposition, Mr. Goanos hedged away from the opinion that the insured clearly made a misrepresentation in question 7 and emphasized much more on question 8:

> A-    … But to me, there is overwhelming, it is overwhelming obvious conclusion that ServiceMesh was indeed contemplating…

> Q-    You used the term "overwhelmingly." I think here [his report] you used the term "undoubt[ed]ly". Just before we get into any opinions, anymore opinions, you say that ServiceMesh incorporated undoubtedly contemplated a merger or acquisition and was involved in negotiations of an acquisition, basically prior to the subject application; it that accurate?

---

negotiation between the parties and the target simply accepts it without modification. (*See* Depo. of L. Goanos (Rough) at page 72 lines 11-18). Under such facts there is "contemplation" of a merger without "negotiation." However, it is impossible to imagine it the other way around, i.e., a negotiation of a merger without there being a contemplation of one. Indeed, by necessity, one cannot negotiate a deal if it does not also contemplate it. Accordingly, if Scottsdale cannot show that ServiceMesh "contemplated" the acquisition by CSC, by necessity, it cannot show that they "negotiated" it either.

[16] I note that Mr. Rosenberg may be taking the view that only a board of directors meeting or actions substantially equivalent can represent a company's "contemplation". I have not expressed an opinion on this as I have concluded by way of the above analysis that ServiceMesh did not contemplate or negotiate the acquisition by CSC prior to August 24, 2013, but if I were to express an opinion on this issue, I would agree that some action amounting to the substantial equivalent of Board consideration would constitute a company's "contemplation."

-13

A-    Yes, Well, yes. Definitely contemplated. Negotiated to some extent, yes[17].

37.    Indeed, even Mr. Goanos seems to believe that Scottsdale should be emphasizing question 8, *not* question 7. As he said bluntly in his deposition when asked again about whether ServiceMesh was negotiating a merger: "Well, I don't think negotiating is a standard that Scottsdale I\is hanging its hat on. It is the contemplating a merger or acquisition.[18]"

38.    This shows, at least with respect to question 8, even Scottsdale own expert refuses to say that the insured's answer was clearly or undoubtedly false[19]. Put another way, even in Mr. Goanos's mind, the insured's answer seems to be, at minimum, reasonable.

39.    As an aside, even if Mr. Goanos was correct (and he is not) that the words "contemplate" and "negotiated" should be afforded their "plain-English" meaning, the documents I reviewed illustrate multiple and contrary "plain-English" meanings. For example, the "plain-English" meaning assigned to "contemplate" by the insured is that they cannot contemplate a potential acquisition until the acquirer proposes some terms for them to consider. (Which in this case did not occur until after the inception date of the Scottsdale policy). Mr. Goanos says that this interpretation equates "contemplate" with "consummate"[20]. However, this is clearly not at all what the insured is saying. All that the insured is saying is that they cannot truly contemplate a potential acquisition without having terms to contemplate. If this is a reasonable approach, and it seems to me it is, it precludes Scottsdale from denying coverage for the claim based on question 8 *even if* Scottsdale had other (even other reasonable) interpretations of the words. (And as mentioned earlier, if ServiceMesh did not "contemplate" an acquisition, they certainly could not "negotiate" one.)

---

[17] Depo. of L. Goanos (Rough) at page 37, line 8 to page 38, line 6.
[18] *Ibid*. at page 101, line 24 to page 102, line 3.
[19] Mr. Goanos later attempts to argue that a Las Vegas meeting between the parties was a "negotiation" of the sale of the company even though he readily admits no terms of the sale were ever discussed (page 67, lines 18-25). Other evidence seems to indicate that the real purpose of this meeting, at from ServiceMesh's point of view, was to move along the customer relationship.
[20] *See* Goanos Report, para 42.

-14-

40.     In sum, Mr. Goanos's plain-English approach to the interpretation of the words "contemplate" and "negotiated" is inconsistent with industry custom and practice. Rather, those words need to viewed as having special meaning in the context of a M&A transaction, and once viewed in that light, the insured neither "contemplate[d]" or "negotiated" the CSC acquisition during the relevant time periods[21].

M&A RISKS ARE IMPORTANT TO THE INSURANCE CARRIER AND SHOULD BE UNDERWRITTEN

41.     In paragraphs 43 – 54 of his report, Mr. Goanos discusses the importance of underwriting and specifically the importance role M&A risks and claims play in the mind of a good D&O underwriter. For example in paragraph 49 of his report, Mr. Goanos comments "Assessing information concerning actual or contemplated M&A activity is a cornerstone of the sound underwriting of Management Liability Insurance due to the potential severity of claims related to M&A situations."  I agree.

42.     However, Mr. Goanos draws the wrong *conclusions* from these correct industry observations.  Indeed, his misses the whole point of this case.

43.     In paragraph 53, Mr. Goanos states that "[o]nce Scottsdale was in possession of additional information regarding a potential ServiceMesh M&A situation, Scottsdale could have altered its renewal quote accordingly."

44.     What Mr. Goanos is missing is that on October 14, 2013, Scottsdale *was* in possession of sufficient information about the timing of the potential CSC acquisition to raise questions, ask for clarity from its insured and, if it deemed it prudent from an underwriting point of view, seek to alter the Run-Off quote it was preparing.

45.     As I discussed in my initial report[22]:

---

[21] Indeed, even if the words *would* have a plain-English meaning, Scottsdale is still prevented from denying coverage for the underlying claim as the insured's interpretation of the words plain-English meaning is a reasonable one.
[22] T. Sagalow Expert Report, para 31.i.1.

-15-

1  Scottsdale would go back and review the insured's renewal application with special

2  attention to the insured's negative answers to questions 7 and 8 dealing with M&A

3  activity and if they believed there was a material misrepresentation and/or an

4  intention to deceive in the insured's answer to those questions they would so advise

5  the insured indicating while they are happy to take the run-off premium, the insured

6  should know that a future run-claim might be denied for application

7  misrepresentation. In this scenario, the insurer might offer to "adjust" the premium

8  charged for the run-off coverage option to what it would have been if the insured

   had answered questions 7 or 8 in the affirmative.

9  46.   I should note that the above does not simply represent my view of proper D&O

10  underwriting of a run-off in the situation that Scottsdale found itself but Scottsdale's own

11  view based *multiple* deposition testimonies of the people charged with underwriting. As

12  I wrote in my initial report:

13  Jesse Chao[23]

14
15  Q-   So if you had and you had seen the responses to 7 and 8, still in front of you

16  right, there on page 3137, would that have effected in any way your ability to

   underwrite the runoff coverage at this time?

17
18  A-   (after form objection) More likely than not, I'd probably ask for details

19
20  Paul Tomasi[24]

21  Q-   So there is an underwriting process to runoff coverages. It is not just a gratis

22  thing that's given to the insured whenever they purchase a business and

23  management liability policy; is that right?

24  A-   The basis for the runoff coverage, when you say an underwriting component,

25  *in our minds is really related back towards questions 7 and 8 in the*

26  _____

27  [23] Depo. of J. Chao at page 127.
   [24] Depo. of P. Tomasi at page 197, line 7 to page 198, line 18.

28

-16-

1           *application*, whether or not they are contemplating acquisition, something

2           like that. That really would trigger, from our standpoint, the idea that an

3           insured may have an increased risk or not increased risk in a takeover

          situation. (Emphasis added)

4

5         And perhaps most obviously from Mr. Matthew Parr:

6

7         Matthew Parr[25]

8         Q-    Would you ever look at the application supporting a policy when the

9         insured asks to elect runoff before issuing that runoff?

10         A-    If something didn't seem right, the underwriter would look back through –

11         not just the application, but would just look back through the file and see if, I don't

12         know, if something didn't seem right, like maybe a time frame or something, you

13         know…

14         Q-    Let's say you looked back at the file and the time frame didn't seem right,

15         right? What would you do?

16         A-    I would probably start asking some questions. You would probably talk to

17         the broker and try to figure out exactly what's going on with the insured. When did

18         the transaction happen or what happened, *when did they know about it, stuff along*

19         *those lines*. (Emphasis added)

20    47.   Thus, according to both myself and Scottsdale, the proper course of conduct in the

21         situation Scottsdale found itself with ServiceMesh would have been to review the file,

22         including most importantly questions 7 and 8 of the renewal application, and if the

23         "timing" of the CSC acquisition "didn't seem right" (and I can see that it might not have)

24         then to ask questions of the insured until either the underwriters were satisfied or advise

25         the insured that they were and that accordingly a future M&A related claim might be

        denied.

26

27 _____

  [25] Depo. of M. Parr at page 260, line 9 to page 261, line 4.

28

48. A related issue deals with was whether the risk of a takeover was already baked into ServiceMesh's premium.  If it was, then any additional information provided to Scottsdale would not have had a material impact on underwriting but simply advised them of the possibility that a transaction whose risk is already incorporated into the insured's premium calculations might occur.

49. In this regard, Mr. Goanos admitted in his deposition that there might not always be a premium increase when an insured indicates "yes" to the M&A questions in the application depending upon whether that risk was already part of the premium the insured paid and the carrier's rating plan in which case the underwriter would "do nothing"[26].

50. In this case, there is strong evidence that the risk of a Takeover (as defined in the policy) was already baked into ServiceMesh's premium. Indeed, Scottsdale's rating plan had a specific scheduled debit or credit for "Takeover Potential."

51. As discussed with Mr. Goanos, the rating plan worksheets for ServiceMesh indicated a sharply increasing "Takeover Potential" debits (meaning increase in premium) for ServiceMesh in the years leading up to the CSC acquisition.  Specifically the worksheets show that in the three year period leading up to the 2013 renewal the "Takeover Potential" debit percentage charge went from 0% (meaning no additional premium) to 25% (meaning a 25% additional premium) to more than 91%[27].

52. Bizarrely, when asked about this, Mr. Goanos seems to dismiss in their entirety rating plans' debits and credits calling them "illusory" and arguing that underwriters ignore them and simply put debits and credits in whatever category they please as a way of backing into whatever premium the insurance broker is insisting upon[28].

53. Equally bizarre is Mr. Tomasi's testimony that the debit line in the Scottsdale rating plan labeled "Takeover Potential" was used by Scottsdale underwriters as a catch-all to put any debit they wanted regardless of whether it was the risk of a Takeover or not.

[26] Depo. of L. Goanos (Rough) at page 141, lines 2-12; page 164, line 17-25.
[27] *Ibid*. at page 153-160 discussing BATS numbers 002801, 003129 and 003161.
[28] *See, e.g*., Depo. of L. Goanos (Rough) at page 150, lines 9-19.

-18-

Frankly, this makes no sense and is contrary to industry custom and good underwriting practices for a number of reasons. First, as Mr. Goanos and I both opine, M&A risks are important to keep track of, i.e. to underwrite, for an insurance carrier due to their potential severity. That is why good D&O rating plans have a separate M&A or Takeover Potential debit line. Mr. Goanos in his deposition admitted that the reference to "Takeover" in Scottsdale rating plan was a reference to "Takeover" as defined in the Scottsdale policy, i.e. a transaction like CSC acquiring the insured. In addition, MGAs (Managing General Agents) like E-Risk have to meet regularly with their insurance company partners (Scottsdale) who have given them authority (known as "giving the pen") to write business and would be expected to report on a regular basis on how they are handling high risk areas such as M&A. As part of this reporting responsibility, MGAs are expected to be able to indicate how the Takeover Potential debit has trended over the underwriting year. Is E-Risk charging a higher debit on a portfolio basis, a lower one, etc.? In only way to provide this information is to keep "clean" the use of the Takeover Potential debit. Finally, the notion of using the Takeover Potential debit as a catch-all makes especially little sense in a surplus lines product, as is the case here, because the rating plan does not have to filed and approved by any state department of insurance. Thus, if E-Risk wanted a catch-all debit in their rating plan, they could instantaneously add one without the need to seek approval from any insurance regulator.

54. Mr. Goanos ends this part of his report with the following observation:

> It is important to keep in mind that Scottsdale does not have a monopoly on writing management liability insurance– I believe that well over 30 carriers currently offer the product– so if Scottsdale tried to impose any terms, conditions or premium increases the ServiceMesh deemed unacceptable, service match within be free to shop around among many other insurers for competing quotes[29].

55. Again, Mr. Goanos makes a correct observation with the wrong conclusion. The fact that ServiceMesh had alternatives to purchasing the Run-Off Coverage is *exactly* my point. However, in order to know to explore those alternatives, they needed to know that

---

[29] L. Goanos Report, para 54.

-19-

Scottsdale had a problem, or might have a problem, with their application answers
resulting in Scottsdale denying coverage for the very type of claim (M&A Claim) for
which they (and other insureds) decide to buy Run-Off.

"CONTEMPLATE" MEANS 'THNKING ABOUT' SOMETHING BY A 'SENIOR
MANAGER' OF THE COMPANY

56.  In paragraphs 55-62, Mr. Goanos argues that "contemplate" means "thinking about"
     (consistent with the "plain-English" theory) and that ServiceMesh was "thinking about"
     something as long as a single senior manager of the company is thinking about it.  In his
     deposition, he frequently reiterated his opinion that contemplate, even in the context of
     M&A, does not mean anything more than "thinking about."[30] I disagree.

57.  I have already discussed Mr. Goanos's theory that "contemplate" means "thinking about"
     earlier in the report (and, in a similar fashion, the theory that to "negotiate" means to
     "confer"), the related issue Mr. Goanos discusses in this section of his report is *who* in
     the organization must be the one to "contemplate" or "negotiate" in order to trigger a
     "yes" answer to Scottsdale's M&A questions.

58.  This is an important issue because the application only says that the "Company",
     meaning ServiceMesh, must "contemplate" or have been involved in a "negotiated"
     merger.  As a company can only act through its people, the question is which of its
     people counts as being the "Company" for the purposes of question 7 and 8 of the
     Scottsdale application.

59.  Scottsdale has taken an extreme position on this issue, at least as articulated by its
     representatives in their depositions indicating if *anyone* in the entire ServiceMesh
     organization "contemplate[d]" a merger than the "Company" has contemplate[d]" a
     merger.

60.  Mr. Goanos seems to distance himself from such extremes but does imply that "someone
     apparently" asked Mr. Douglas to initiate M&A discussions in January 2013.  Putting
     aside whether this in fact happened (and the weight of the evidence is it did not), Mr.

---

[30] *See, e.g.*, Depo. of L. Goanos (Rough) at page 63, lines 7-10; 25.

Goanos seems to be implying that if Mr. Douglas on his own and without instruction initiated "M&A discussions", that would not constitute "contemplation" or "negotiation" by the Company[31]. If Mr. Goanos is saying this, I agree with him.

61. However, Mr. Goanos also states in the same paragraph that if Mr. Douglas was "instructed" to initiate M&A discussions, it doesn't matter if the person was a member of the Board[32]. Indeed, according to Mr. Goanos as long as "there was knowledge among senior managers that M&A discussions were ongoing", this would be sufficient for the Company to "contemplate" the CSC acquisition. I disagree with him on these points.

62. In fact, in his deposition Mr. Goanos seems to take the position that even if a *single* management person is "thinking about" a merger or acquisition, that is sufficient to trigger a "yes" answer to question 8 even if no actual *action* toward M&A was been taken[33].

63. Of course, it is black letter corporate law that corporations act through their board of directors. And, certainly, with respect to merger decisions, in every corporate by-laws I have ever seen the board is *the body* that makes the M&A decision (subject to approval of the company's shareholders, of course.)

64. Can a merger be "contemplate[d]" by the "Company" other than by its board of directors (presumably by a majority thereof)? For the purposes of this case, that question is irrelevant. The extreme suggested by Scottsdale in deposition testimony is both illogical and inconsistent with proper D&O underwriting. If the janitor of the company while he was sweeping the floor wondered about whether the company would be acquired, hoping that it would and pondered about how much money he would make – everyone in small tech companies usually get stock options – would that be considered to be contemplating "by the Company"? Of course not. The term "Company" is defined in the Scottsdale policy as ServiceMesh. The policy also defines the term "Directors and Officers" meaning the officers and directors of ServiceMesh. The terms are distinct under the

---

[31] L. Goanos Report, para 62.
[32] *Ibid.*
[33] See for example, Depo of L. Goanos (Rough) at page 64, lines 2-13.

policy and do not overlap. When the term "Company" is used in the application, it is reasonable to refer to the policy and its definition of this term, and to assume that "ServiceMesh" means something other than its separately-defined "Directors and Officers." With respect to "contemplating" an offer of purchase, only the acts of the ServiceMesh Board or their functional equivalent would constitute "contemplation" of an offer by the corporation.

65. Related to the "who" issue is the "when" issue, i.e., *when* must the company contemplate a merger or acquisition or have knowledge of an existing or 18 month prior negotiation? Here, Mr. Goanos and I are aligned. The application is asking about the company's current state of mind as of the date of the application[34]. Accordingly, as Mr. Goanos admits in his deposition, in the hypothetical that ServiceMesh had earlier in the year "contemplated" a merger or acquisition (which it did not) but no longer contemplated it on June 26, 2013, the date of the applications, ServiceMesh would not have to answer "yes" to question 8 of the Scottsdale renewal application since, as of the date of that application, they were no longer contemplating a merger or acquisition[35]. Put another way, Scottsdale must show that as of June 26, 2013 (or thereafter but prior to August 24, 2013), ServiceMesh contemplated a merger or acquisition in order to show a misrepresentation in question 8. Any contemplation prior to June 26, 2013 is not relevant.

THE IMPACT OF OFFERING TWO RUN-OFF QUOTES

66. As a foundation, as mentioned earlier, it is important to keep in mind that both I and Mr. Goanos believe that M&A risks and transactions are important to both the insured who is looking for coverage for such claims and the insurer that wants to underwrite such risks.

67. In paragraphs 63-76, the final section of his report, Mr. Goanos discusses the impact of Scottsdale offering run-off coverage to ServiceMesh without first advising ServiceMesh that there may be an issue with its renewal application which would exclude coverage for any CSC acquisition claim.

---

[34] Depo. of L. Goanos (Rough) at page 65, lines 3-17.
[35] *Ibid.* at page 65, line 18 to page 66, line 11.

-22-

68. Mr. Goanos first takes issue with my "option 2" as stated in my initial report. Option 2 was the option for Scottsdale to purposefully not underwrite the Run-Off Coverage but simply accept the premium and issue the Run-Off endorsement under my theory that on a portfolio basis it would be a more valuable use of the underwriter's time to work on other accounts than to spend time underwriting each run-off request (including looking at the file, reviewing the last application etc.). The theory behind this would be that in very few cases such underwriting will produce a potential red flag prompting a revaluation of the providing of run-off coverage pursuant to the terms of the policy and time is better spent elsewhere even knowing that a failure to underwrite would prevent a later denial on grounds that would have arisen had the prior underwriting taken place.

69. Mr. Goanos is critical of me even giving Scottsdale this option because such conduct would have resulted in Scottsdale paying an approximately $4.5 million loss which could have otherwise been avoided[36]. A second reason Mr. Goanos gives is that such a "head-in-the-sand" approach would jeopardize Scottsdale's relationship with their reinsurers.

70. These are not legitimate criticisms of my option 2 opinion. First, it is axiomatic that a decision cannot be viewed as a poor one just because in retrospect things did not work. Thus, the fact that Scottsdale is going to end up paying $4.5 million in a loss which *in the opinion of Mr. Goanos* they would not have otherwise paid is not a reason in logic as to whether Scottsdale hypothetically choosing to refuse to underwrite the Run-Off was a good or bad one at the time. As to his second reason, after 35 years dealing with reinsurers I can say with some confidence that they will not second guess an individual decision as to how to handle a run-off request. Their focus is on the entire portfolio of business, not a single risk.

71. However, there is one thing about this issue that Mr. Goanos and I do agree, that option 1 (underwriting) is the better option. I say that it is the preferred approach while Mr. Goanos says it is the only approach. More importantly, perhaps is the fact that *Scottsdale* says this is the approach they should have used in this case[37]. Indeed, it is the failure to underwrite (and ask the appropriate questions which would have flowed from

---

[36] L. Goanos Report at para 65.

[37] *See* deposition testimony quoted in paragraph 40 of L. Goanos Report.

such underwriting) which forms the basis of many of my opinions. In this regard, I am comforted by knowing that Mr. Goanos believes that underwriting is the correct course of action.

72. In my original report and deposition, I opined that not having written underwriting guidelines makes it more possible that an individual underwriter will go "off track" and mishandle a particular underwriting situation. Here, for example, despite the testimony of three individuals at Scottsdale that in a scenario where the "timing" between the answering of question 7 and 8 of Scottsdale's renewal application and the request for Run-Off "seemed not right", additional questions to the insured should be asked. In the case of ServiceMesh this was not done. Presumably had there been written underwriting guidelines spelling out this rule, it would be more likely that it would have been followed (with the results described in option 1).

73. Mr. Goanos, in substance, agreed with me in his deposition although he phrased his agreement in the negative:

A- You don't necessarily need written guidelines if that if what you are intimating. Generally guidelines, yes. But guidelines can be verbal in people's understanding their mind. I don't think you need to have it necessarily in writing *if* you are training people and explaining to them what's important. (Emphasis added). And the fact that there is a question on the application lets any underwriter know this is a critical issue to us. I don't think you need written guidelines necessarily. It is probably *best practices* it is by no means the exclusive practice that should be implemented. (emphasis added)

74. In sum, Mr. Goanos is saying that if you do oral training correctly, especially with respect to the insured's application answers, you might be able to forgo putting things in writing. Of course, Mr. Goanos's counsel only works if your oral training is complete. Based on the actions of the underwriters in this case, any oral training given to them was far from complete.

-24-

SCOTTSDALE OBLIGATION TO ACT IN GOOD FAITH AND FAIR DEALING WITH
SERVICEMESH

75.  In my original report, I opined that Scottsdale had an obligation to act in good faith and
fair dealings with its insureds, including ServiceMesh[38]. In his deposition, Mr. Goanos
was asked this question directly and responded that he also believes this:

Q-  Would you agree that an insurance company has an obligation of good faith and
fair dealing to its insured?

A-  Yes, certainly.[39]

76.  Where Mr. Goanos and I seem to strongly disagree is what Scottsdale had to do in order
to act in good faith and fair dealings with ServiceMesh.

77.  In this report, Mr. Goanos argues it was to do nothing until the claim came in and then
exclude the claim.  To put it mildly, I disagree.

78.  More specifically, Mr. Goanos argues in paragraphs 67 and 68 that a carrier never has an
obligation to advise its insured that a type of claim it knows the insured is concerned
about might be excluded in the policy.  In his deposition, he says this even more forcibly
as illustrated in the following exchange[40]:

Q-  And so if you are in an underwriting meeting with a head of a company, right you
as an underwriter hypothetical, and the company – it is a renewal underwriting
meeting and the head of the company is talking about how hey, I am so excited
about the coming year we're going to grow throughout the United States and we're
going to open up this plant in Canada.  Right we're going to manufacture widgets
and you know, you know right when he says that, that there is an exclusion in the

---

[38] T. Sagalow expert report at para 46.

[39] See Depo. of L. Goanos at page 123, line 23 to page 124 line 2.  ("Good faith and fair dealings"
can a meaning in insurance law and code.  However, neither myself nor Mr. Goanos is referring to
these codifications nor are speaking as an attorney (although we both are).  Rather, these concepts
also have a parallel in insurance industry practice, custom and standards.  It is to that industry
practice, custom and standards to which are referring.)

[40] *Ibid.* at page 124, line 6 to page 127, line 11.

policy that you guys have that they are about to renew for any liabilities arising from an operations outside the US, so that Canadian plant. Do you have an obligation to say something and then to that insured during the underwriting meeting?

A- No.

Q- You don't have to say to them that that risk is completely outside the policy, just by then telling you that that?

A- The policy speaks for itself, first. Second, you wouldn't know, maybe they're buying a separate Canadian D&O policy for Canadian operations…. The meeting would go on forever if you were to respond everything they say in trying somehow dovetail into the policy and how could potentially apply. You would be there all day…

Q- In that underwriting meeting in the hypothetical, right, I'm going to clarify and say there're no other facts year, there were no other factors, you know without a shred of doubt are not going to be covered by any insurance that this company that your underwriting meet has… You have no obligation to say to that insured before they place with you and pay you a premium that's not going to be covered by your policy that you're about to buy?

A- Absolutely not. The policy speaks for itself. You employ an insurance broker theoretically sophisticated individual who understands the coverage, that's their duty, not you was a carrier. You don't have an obligation to counsel the insured on what is and is not covered that's why they hire a broker, and that's the broker's job. Absolutely not for the underwriter

79. I am certainly glad that Mr. Goanos did not advise me of his approach to honest and open communication with his insureds when he had a matrix reporting relationship to me at National Union. Suffice to say that the treatment of the insured in the above hypothetical according to Mr. Goanos not only is it below proper industry standards but also contrary to the reasonable expectations of any insured.

80.     The reality is that in circumstances, as is the case here, where the underwriter (Scottsdale) knows that an insured when seeking coverage (Run-off) is seeking coverage for, among other things, a particular risk (M&A related claim) and the underwriter has information in its possession (the renewal application) which it did or should have reviewed at the time of the Run-Off request[41] which information should have prompted a "something didn't seem right, like maybe the timeframe" (in the observant words of Scottsdale underwriter Matthew Parr) reaction, the underwriter must inquire to the insured about any concern he or she might have or forgo the right to do so later.

81.     Mr. Goanos takes the opposite view in paragraphs 72-75 of his report concluding, for example, that Scottsdale should have reviewed questions 7 and 8 of the application only "when something occurs to trigger the need for such a review – such as the filing of a Claim[42]" In other words, in Mr. Goanos's view of the world, Scottsdale can and should sit back, forget about looking at the application, take the insured's money, then once the very type of claim the insured purchased the Run-Off for comes in look at the application it had in its file for years and deny the claim based on that application.

82.     Mr. Goanos doubles down on this position in his deposition in seeming contradiction to Scottsdale's depositions[43]:

Q-     What if something didn't seem right to the underwriters when they got the request, could they say to the insured hey, I want to have a dialogue with you about additional premium because, you know, the timeframe between when this policy issued and when you are asking for this coverage is a little short. In that situation, when that happen, with that conversation happened?

---

[41] And remember that on the day of the Run-Off request, October 14, 2013, Scottsdale had been given a HCC application also dated June 26, 2013 which contained a similar question on contemplating M&A to which the insured also answered "no" thus putting on the front burner, so to speak, the so-called "timeframe issue" (i.e. no contemplation/negotiation as of June 26, 2013- August 24, 2013 but in negotiations to be acquired a mere seven weeks later on October 14, 2013) which should have prompted questions from the underwriter at that time (if any questions were to be asked).

[42] See L. Goanos Report at para 74.

[43] Depo. of Larry Goanos (Rough) at page 136, line 17 to page 137, line 5.

-27-

A-   I don't think so.

Q-   Never?

A-   No, you have no right to ask for anything.  Time frame notwithstanding…

83.   Mr. Goanos is then asked whether he would provide the same answer if the timeframe between the expiration date of the policy and the request for run-off was not seven weeks but a single day.  Would "the underwriter's hands still be tied"?  His answer[44]:

A-  Yes…even in that instance you would be able to do nothing other than issue it [the Run-off coverage] and *investigate later*. (emphasis added)

Q-   When you say investigate later, you mean say, why?...

A-  … the only ever triggers a further inquiry when a [sic] claim comes in and they have an actual situation and then they say oh, now we see that this merger started sooner or whatever it might is a claim. After the claim carrier will be happy to take the money and everyone go into the sunset but that's not the case here.

84.   To Mr. Goanos this behavior of asking no questions even when something doesn't "seem right" but just "be happy to take the money", wait for the claim, then investigate and deny the claim does not violate the insurer's industry obligation to act in good faith and fair dealings with its insured.  I disagree.[45]

<u>CONCLUSION</u>

85.   For the reasons set forth above, I disagree with Mr. Goanos and have the expert opinion that under industry custom and practice:

a.   The terms "contemplate" and "negotiated" as they are used in the Scottsdale renewal application are words of a special meaning and not plain-English meaning.

---

[44] *Ibid*. at page 137, line 25; page 138, lines 22 to page 139, line 3, 14-22.
[45] For matter of completeness, I note that in his deposition Mr. Goanos withdrew his criticism of my report stated in his paragraphs 69-71 hence there is no reason to comment on those paragraphs of his report.

b. That the actions (and lack of actions) by ServiceMesh based on the materials I have read do not indicate a mental state of "contemplation" by "the Company" or that "the Company" negotiated a merger or acquisition (actual or attempted) in the 18 month period prior to the date of the renewal application.

c. That even if the terms "contemplate" and "negotiated" were to be interpreted per their plain-English meaning, the insured's interpretation of those terms is reasonable.

d. For the above reasons, the insured did not make a material misrepresentation when it answered "no" to questions 7 and 8 of the Scottsdale renewal application.

e. As an additional and independent reason, the decision by Scottsdale to not discuss with the insured any possible coverage concern arising out of the insured's answer to questions 7 and 8 of the renewal application, and instead simply to issue the Run-Off endorsement, precluded them from raising the misrepresentation issue years later after the claim was submitted. Instead what Scottsdale should have done, consistent with industry custom and practice, was to discuss any coverage issues with the insured in October 2013 to allow the insured to either resolve those issues to the satisfaction of the insurer or purchase Run-Off coverage elsewhere in the market.



Ty R. Sagalow